*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

BRADLEY NOLAN CLARK,

        Defendant-Appellant.

UNPUBLISHED
July 21, 2022

No. 352874
Wayne Circuit Court
LC No. 18-008627-02-FH

Before: BOONSTRA, P.J., and GLEICHER and LETICA, JJ.

PER CURIAM.

A jury convicted Detroit Police Officer Bradley Nolan Clark of common-law misconduct in office, MCL 750.505, and breaking and entering without permission, MCL 750.115. The jury acquitted Clark of more serious charges: second and third-degree home invasion, MCL 750.110a(3) and (4), and malicious destruction of property, MCL 750.377a(1)(d). The evidence presented insufficiently supported that Officer Clark possessed the necessary intent to commit misconduct in office and the trial judge made improper comments exhibiting bias against Officer Clark. These errors irreparably tainted the trial. We reverse Officer's Clark's convictions.

## I. BACKGROUND

On January 22, 2018, Detroit Police Officer Clark, Officer Justin Lyons, and Sergeant Paul Glaza went to 22554 Pembroke in Detroit to find Michael Hopkins. The officers had opened an investigation into Hopkins on December 4, 2017. The mother of Hopkins' children, PC, reported that Hopkins had broken into her home and sent her threatening text messages. The threatening messages continued for several weeks and became more aggressive and violent over time. Hopkins also started stalking PC. During this period, Officer Clark secured a photograph of Hopkins and learned from the Secretary of State that the address listed on his driver's license was 22554 Pembroke. Officer Clark conducted surveillance at 22554 Pembroke, but never saw Hopkins. However, PC insisted that Hopkins lived at that address and had been driving a rented white SUV with out-of-state plates.

On January 22, 2018, PC came to the station in tears to report new messages threatening to kill her. The officers determined to visit 22554 Pembroke in an attempt to locate Hopkins.

Upon their arrival, they observed a white SUV with Arizona plates parked in the driveway. Officer Clark approached the front door, while Sergeant Glaza stood to the side in the front yard and Officer Lyons stood at the back corner of the house where he could see the home's side door and backyard.

Officer Clark testified that he was certain Hopkins was inside. When he knocked on the front door, Tashar Cornelius answered. Officer Clark inquired, "Is Michael here?" Cornelius did not immediately tell officers that he lived alone in the home or that he did not know Michael. Instead, he merely said, "uh uh, no." Cornelius then told the officers to "do their research," which would reveal that the home was titled in his name, not that of "Michael's mother." Cornelius's driver's license did not list the Pembroke address as his residence. Cornelius claimed that he had rented the SUV for work. When Officer Clark asked him to get the keys and press the alarm button, Cornelius went inside and locked the door. He found the keys, sounded the vehicle's alarm, and returned to the front door. Officer Clark and Officer Lyons insisted they heard Cornelius talking to someone inside and believed that person to be Hopkins. Also during this time, Officer Lyons asserted that he heard someone barricading the side door to the house. Later video footage revealed a board across that doorway.

Cornelius returned to the front door but would not allow the officers to enter because they did not possess a warrant. Cornelius attempted to shut the door, but Officer Clark put his foot in the doorway. He claimed to observe Cornelius put his hand behind his back, as if reaching for a weapon. When Cornelius successfully moved Officer Clark's foot and shut the door, Sergeant Glaza stated, "foot, foot, foot." Officer Clark understood this as an instruction to kick the door open. Officer Clark did so and ordered Cornelius to the ground. For approximately 30 minutes, the officers searched the small house for any other occupants (including the basement and attic), but no one else was inside. The officers found a taser that Cornelius, a felon, was not permitted to possess. They arrested Cornelius, but he was released without being charged 36 hours later.

Later investigation revealed that Cornelius had lived alone at 22554 Pembroke for four years and had rented the SUV. Cornelius did not know Hopkins; however, a couple of pieces of mail addressed to Hopkins had come to the house over the years. Cornelius simply threw them away. Cornelius's mother investigated and learned that Hopkins's mother had lived in the home about five years before the incident. Cornelius testified that repairs to the door cost between $400 and $500.

Officers successfully tracked Hopkins down later that day. He was at a friend's home and was, in fact, driving a rented white SUV with out-of-state plates.

Approximately 10 months later, Officer Clark was charged with several crimes related to his involvement in the entry and search at the Pembroke address.[1] Officers Clark and Lyons both

---

[1] Sergeant Glaza pleaded nolo contendere to malicious destruction of property, a felony, and breaking and entering without permission, a misdemeanor.

testified at trial, and the bodycam footage from all three officers was presented.[2]  As noted, the jury acquitted Officer Clark of second and third-degree home invasion and malicious destruction of property, but convicted him of common-law misconduct in office and breaking and entering without permission.  The trial court sentenced Officer Clark to one year of nonreporting probation. He now appeals by right.

## II.  PROSECUTORIAL CHARGING DISCRETION

Clark first contends that the prosecution abused its discretion by charging him with common-law misconduct in office because the elements of that offense were covered by the unlawful entry statute, MCL 750.115.  He further asserts that his trial counsel should have moved to dismiss the common-law charge.

Clark did not challenge the prosecutor's charging decision below and our review is limited to plain error.  *People v Propp*, 330 Mich App 151, 169; 946 NW2d 786 (2019).  "Reversal is warranted only when the plain, unpreserved error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity, or public reputation of judicial proceedings independent of the defendant's innocence."  *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999) (quotation marks and citation omitted).  The defendant bears the burden of showing "that the error affected the outcome of the lower court proceedings."  *Id*. at 763.

Clark also did not challenge his counsel's performance below.  He conceded on appeal that this issue can be reviewed from the existing record and that there is no need to remand for a hearing to develop the record further.  To establish the right to a new trial based on the ineffective assistance of counsel, a defendant must satisfy two components: "First, the defendant must show that counsel's performance was deficient. . . .  Second, the defendant must show that the deficient performance prejudiced the defense."  *Strickland v Washington*, 466 US 668, 687; 104 S Ct 2052; 80 L Ed 2d 674 (1984).  To establish that counsel's performance was deficient, a defendant must show that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms.  *People v Solmonson*, 261 Mich App 657, 663; 683 NW2d 761 (2004).  To establish prejudice, the defendant must demonstrate a reasonable probability that, but for counsel's errors, the result of the proceedings would have differed.  *Id*. at 663-664.

The prosecutor is an officer of the executive branch of government and courts must tread lightly in interfering with the prosecutor's duties.  See *Genesee Prosecutor v Genesee Circuit Judge*, 386 Mich 672, 683; 194 NW2d 693 (1972).  Courts may interfere with a prosecutor's charging decision "only if it appears on the record that they have abused the power confided in them."  *Genesee Prosecutor v Genesee Circuit Judge*, 391 Mich 115, 121; 215 NW2d 145 (1974). This is a very high standard.  Our role is to "protect[] against" "the danger of arbitrary and discriminatory law enforcement."  *People v Ford*, 417 Mich 66, 84; 331 NW2d 878 (1982).  And "[p]rosecutors have broad discretion in determining" what charges to bring.  *Id*.  We may only find an abuse of the prosecutor's charging discretion where the prosecutor's " 'activities or decisions . . . are unconstitutional, illegal, or ultra vires.' "  *People v Barksdale*, 219 Mich App

---

[2] We note that Sergeant Glaza's hands blocked much of the footage from his camera, as did a jacket worn by Officer Lyons.

484, 487; 556 NW2d 521 (1996), quoting *People v Morrow*, 214 Mich App 158, 161; 542 NW2d 324 (1995). Employing lesser scrutiny would violate the separation of powers doctrine. *Barksdale*, 219 Mich App at 488.

We cannot conclude on this record that the prosecutor's charging decision was so egregious as to be "unconstitutional, illegal, or ultra vires." The prosecutor charged Officer Clark with the common-law offense of misconduct in office. Prosecution for this offense is permitted under MCL 750.505, which provides, "[a]ny person who shall commit any indictable offense at the common law, for the punishment of which no provision is expressly made by any statute of this state, shall be guilty of a felony[.]" "The common-law offense of misconduct in office has been defined as ' "corrupt behavior by an officer in the exercise of the duties of his office or while acting under color of his office." ' " *People v Milton*, 257 Mich App 467, 470-471; 668 NW2d 387 (2003), quoting *People v Coutu*, 459 Mich 348, 354; 589 NW2d 458 (1999), quoting Perkins & Boyce, Criminal Law (3d ed), p 543. Relevant to the current case, the prosecutor's charge would be "sustainable" if "it set[] forth" either "malfeasance, committing a wrongful act" or "misfeasance, performing a lawful act in a wrongful manner." *Milton*, 257 Mich App at 471. To ultimately convict on a charge of misconduct in office, the prosecutor must prove that a public officer (which includes a police officer)[3] engaged in misconduct "in the exercise of the duties of the office or under the color of the office" and the behavior was "corrupt." *Id*. "Corrupt" intent requires at least "intentional or purposeful misbehavior or wrongful conduct." *Id*.[4]

The prosecutor also charged Officer Clark with breaking and entering without permission in violation of MCL 750.115. "An indictable common-law offense can be charged by the prosecution pursuant to MCL 750.505 *unless punishment for that offense is otherwise expressly provided for by statute*. It is proper to dismiss a charge brought under MCL 750.505 if *the charge sets forth all the elements of a statutory offense*[.]" *People v Waterstone*, 296 Mich App 121, 134; 818 NW2d 432 (2012) (cleaned up, emphasis added). Accordingly, if MCL 750.115 "sets forth all the elements of" common-law misconduct in office, the prosecutor could not charge Officer Clark with the common-law offense. See *People v Thomas*, 438 Mich 448, 453; 475 NW2d 288 (1991).

MCL 750.115 provides:

> (1) Any person who breaks and enters or enters without breaking, any dwelling, house, . . . or structure used or kept for public or private use, . . . whether occupied or unoccupied, without first obtaining permission to enter from the owner or occupant, agent, or person having immediate control thereof, is guilty of a misdemeanor.

---

[3] See *People v Coutu*, 459 Mich 348, 355; 589 NW2d 458 (1999); *People v Hardrick*, 258 Mich App 238, 245; 671 NW2d 548 (2003).

[4] We discuss these elements in greater detail when analyzing Officer Clark's contention that insufficient evidence supported his convictions.

(2) Subsection (1) does not apply to entering without breaking, any place which at the time of the entry was open to the public, unless the entry was expressly denied. Subsection (1) does not apply if the breaking and entering or entering without breaking was committed by a peace officer or an individual under the peace officer's direction in the lawful performance of his or her duties as a peace officer.

This Court has explained that MCL 750.115 can be violated in two ways: by "entering without breaking" or "entering without the owner's permission." *People v Heft*, 299 Mich App 69, 75; 829 NW2d 266 (2012). Officer Clark was charged with the second method: breaking and entering without permission. Additionally, because Clark is a peace officer, he could not be guilty of this offense if the breaking and entering was committed in the lawful performance of his duties, pursuant to MCL 750.115(2).

Although both charges arose out of the same course of conduct, the common-law charge did not set forth all the elements of the statutory offense, thus both could be raised against Officer Clark. The misconduct in office charge includes an element that the breaking and entering without permission charge does not—corrupt intent. Breaking and entering without permission does not require intentional or purposeful behavior; it merely requires that the breaking and entering was committed by a peace officer not in the lawful performance of his duties. This is equivalent to a finding of misconduct or wrongful conduct, but not necessarily misconduct or wrongful conduct carried out purposefully or intentionally. Therefore, prosecution for common-law misconduct in office was not precluded.

As the prosecution did not abuse its power in charging Clark with both offenses, defense counsel had no reason to object below. Counsel cannot be deemed ineffective for failing to raise a meritless challenge. *People v Savage*, 327 Mich App 604, 617; 935 NW2d 69 (2019).

### III. VAGUENESS CHALLENGE

Officer Clark next contends that his conviction of common-law misconduct in office based on a Fourth Amendment violation violates due process because the common-law offense is impermissibly vague as applied. He contends that his trial counsel was ineffective for failing to move to dismiss the misconduct-in-office charge on this basis.

Officer Clark did not raise this argument below and our review is limited to plain error. *Carines*, 460 Mich at 763. "The void-for-vagueness doctrine is derived from the Due Process Clauses of the Fourteenth Amendment of the United States Constitution and Article 1, § 17 of the Michigan Constitution, which guarantee that the state may not deprive a person of life, liberty, or property without due process of law." *People v Miller*, 326 Mich App 719, 738; 929 NW2d 821 (2019). "Void-for-vagueness tenets embrace the principle that a law is unconstitutional 'if its prohibitions are not clearly defined.' " *Johnson v Dep't of Natural Resources*, 310 Mich App 635, 657; 873 NW2d 842 (2015), quoting *Grayned v City of Rockford*, 408 US 104, 108; 92 S Ct 2294; 33 L Ed 2d 222 (1972). "A penal statute is unconstitutionally vague if (1) it does not provide fair notice of the prohibited conduct, (2) it encourages arbitrary or discriminatory enforcement, or (3) its coverage is overbroad and impinges on First Amendment freedoms." *Miller*, 326 Mich App at 738. Clark challenges MCL 750.505 only on the first two grounds.

-5-

A statute does not give fair notice of prohibited conduct if its language does not " 'give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning.' " *Johnson*, 310 Mich App at 657, quoting *Grayned*, 408 US at 108-109.

> A statute cannot use terms that require persons of ordinary intelligence to speculate regarding its meaning and differ about its application. For a statute to be sufficiently definite, its meaning must be fairly ascertainable by reference to judicial interpretations, the common law, dictionaries, treatises, or the commonly accepted meanings of words. [*People v Lawhorn*, 320 Mich App 194, 200; 907 NW2d 832 (2017) (quotation marks and citations omitted).]

However, the Legislature is not required to use words that "have a single meaning" or to "define an offense with mathematical certainty." *Id*. (quotation marks and citations omitted).

These same standards determine whether a statute "encourages arbitrary or discriminatory enforcement."

> "[I]f arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." [*Id*. at 199-200, quoting *Grayned*, 408 US at 108-109.]

Michigan courts have upheld the constitutionally of MCL 750.505 in the face of vagueness challenges time and again. *People v Coutu (On Remand)*, 235 Mich App 695, 705 n 5; 599 NW2d 556 (1999), citing *People v Pickett*, 339 Mich 294, 309-311; 63 NW2d 681 (1954); *People v O'Neal*, 22 Mich App 432, 434-436; 177 NW2d 636 (1970). See also *People v Hardrick*, 258 Mich App 238, 247-248; 671 NW2d 548 (2003). The facts of this case do not warrant a different result.

Officer Clark contends that MCL 750.505 and the common-law charge of misconduct in office contain many vague, undefined terms that limit a party's ability to determine what conduct would be considered illegal and that lead to arbitrary enforcement. As discussed in the previous section, and as will be discussed in even further detail in the next, the terms of both the statute and the common-law offense have been defined repeatedly in many cases, treatises, and dictionaries. There is extensive support for defining "misconduct in office," "corrupt behavior," and all the terms underlying corruption. The evidence simply did not support that Officer Clark's conduct fell within the parameters of the forbidden conduct. However, the statute is not unconstitutionally vague as applied, and counsel had no ground to seek dismissal on this basis.

## IV. SUFFICIENCY OF THE EVIDENCE

Clark next contends that the prosecution presented insufficient evidence to support the corrupt intent element of the misconduct-in-office charge. We review de novo challenges to the sufficiency of the evidence, viewing the evidence in the light most favorable to the prosecution to determine whether a rational fact finder could find the elements of the offense were proven beyond a reasonable doubt. *Miller*, 326 Mich App at 735. As Clark challenges the evidence supporting

the intent element of his offense, we emphasize that "[m]inimal circumstantial evidence and reasonable inferences can sufficiently prove the defendant's state of mind, knowledge, or intent." *Id*. "Intent may be inferred from all the facts and circumstances." *Hardrick*, 258 Mich App at 246. "The question of intent is properly resolved by the trier of fact, and we review a trial court's factual findings for clear error." *Id*. A finding is clearly erroneous if this Court "is left with a definite and firm conviction that a mistake has been made," despite that there is supporting evidence. *People v Lanzo Constr Co*, 272 Mich App 470, 473; 726 NW2d 746 (2006).

"Corruption" for purposes of the misconduct-in-office offense means "depravity, perversion or taint." *Milton*, 257 Mich App at 471.

> "Depravity" is defined as "the state of being depraved" and "depraved" is defined as "morally corrupt or perverted." *Random House Webster's College Dictionary* (1997). "Perversion" is "the act of perverting," and the term "perverted" includes in its definition "misguided; distorted; misinterpreted" and "turned from what is considered right or true." *Id*. The definition of "taint" includes "a trace of something bad or offensive." *Id*. Pursuant to the definitions, a corrupt intent can be shown where there is intentional or purposeful misbehavior or wrongful conduct pertaining to the requirements and duties of office by an officer. See also Perkins & Boyce, [p] 542 ("It is corrupt for an officer purposely to violate the duties of his office."). The corrupt intent needed to prove misconduct of office does not necessarily require an intent for one to profit for oneself. *Thomas*, [438 Mich at 461, n 6]. [*Coutu (On Remand)*, 235 Mich App at 706-707.]

See also *Waterstone*, 296 Mich App at 137-138; *Hardrick*, 258 Mich App at 246; *Milton*, 257 Mich App 471. An officer acts corruptly when he or she "purposely . . . violate[s] the duties of his [or her] office." *Hardrick*, 258 Mich App at 247 (quotation marks and citation omitted). See also *Waterstone*, 296 Mich App at 137-138 ("The Court noted that it is deemed 'corrupt' for a public officer to purposely commit a violation of any duties associated with the officer's job or office.").

However, an officer does not behave corruptly or commit misconduct in office by making negligent or honest errors on the job. Misconduct "does not encompass erroneous acts done by officers in good faith or honest mistakes committed by an officer in the discharge of his duties." *Coutu (On Remand)*, 235 Mich App at 706. See also *Waterstone*, 296 Mich App at 137 n 5; Perkins & Boyce, p 541.

Officer Clark went to 22554 Pembroke with his supervisor, Sergeant Glaza, and Officer Lyons, based on reliable information that Michael Hopkins was inside. PC told the officers that Hopkins lived at that address. Officer Clark confirmed this information with the Secretary of State. Officer Clark conducted surveillance at the house on several occasions across six weeks before finding anyone at home. On the day in question, PC came to the station to report that Hopkins's text messages had become more threatening and violent. Sergeant Glaza determined that he and Officers Clark and Lyons should drive to 22554 Pembroke to determine if Hopkins was home. Sergeant Glaza was the superior officer and he did not secure a warrant for Hopkins's arrest or to enter the home before the officers left the station.

When the officers reached 22554 Pembroke, a white SUV with out-of-state plates was in the driveway. PC had described that Hopkins was driving such a vehicle. (In fact, Hopkins was in possession of a white SUV with out-of-state plates when he was later found.) This observation corroborated PC's information and reasonably persuaded the officers that Hopkins was inside. Officer Clark approached the front door and knocked. Cornelius opened the door and was initially evasive. When asked if Michael was home, Cornelius did not immediately say that he lived at the home alone or that he did not know Michael. He simply answered, "Uh uh, no." The officers asked Cornelius to prove that he lived in the home, but his diver's license listed a different address. They asked Cornelius to prove that the white SUV belonged to him by sounding the alarm. When Cornelius went inside to find the keys, he locked the door. Officer Clark and Officer Lyons could hear Cornelius talking to someone and thought he was retrieving the keys from Hopkins. Officer Lyons was standing outside the back door and heard someone barricading it. (The subsequent search confirmed this). The accumulating evidence further persuaded the officers that Cornelius and Hopkins were both inside. And as Cornelius slammed the door on Officer Clark, he motioned behind his back as though reaching for a weapon. This behavior led the officers to fear that Cornelius, and possibly Hopkins, planned on shooting at them through the door. Only then did Sergeant Glaza order Officer Clark to kick in the door. The officers believed there were exigent circumstances.

Ultimately, the officers were wrong. Hopkins was not inside the house. The only weapon found was a taser. Although the backdoor was barricaded, there was no evidence that Cornelius planned to attack the officers. But incorrectly reaching spur-of-the-moment decisions such as those at issue here does not legally support a charge of misconduct in office.

In cases involving the suppression of evidence under the Fourth Amendment or an officer facing civil liability under 42 USC § 1983, courts have emphasized that police officers must be afforded some leeway to be wrong in order to do their jobs. An officer acting reasonably, although ultimately incorrectly or even illegally, does not often face even *civil* penalties. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham v Connor*, 490 US 386, 396-397; 109 S Ct 1865; 104 L Ed 2d 443 (1989). "Officers frequently must make split-second judgments when deciding whether to arrest, and the content and manner of a suspect's speech may convey vital information—for example, if he is ready to cooperate or rather presents a continuing threat." *Nieves v Bartlett*, ___ US ___; 139 S Ct 1715, 1724; 204 L Ed 2d 1 (2018) (cleaned up). When evaluating the conduct of officers on the job, courts

> are not to view the matter as judges from the comfort and safety of our chambers, fearful of nothing more threatening than the occasional paper cut as we read a cold record accounting of what turned out to be the facts. We must see the situation through the eyes of the officer on the scene who is hampered by incomplete information and forced to make a split-second decision between action and inaction in circumstances where inaction could prove fatal. [*Crosby v Monroe Co*, 394 F3d 1328, 1333-1334 (CA 11 2004).]

The court did not take these standards of police conduct into consideration and did not advise the jury of them. Sergeant Glaza was in charge of the scene. It was his call to go to the

address without a warrant, not Officer Clark's. Sergeant Glaza ordered Officer Clark to kick open the door of 22554 Pembroke; Officer Clark did not make the decision independently. Officer Clark was justified in following the order of his superior office at that moment.[5] In the short span of time of this encounter, Officer Clark reasonably perceived that Hopkins (a violent and wanted man) was inside the home with Cornelius, that the men had barricaded the back door in preparation for a confrontation, and that Cornelius was armed and prepared to shoot at the officers. Officer Clark had to make a split-second judgment call to protect himself, his fellow officers, and civilians who might get caught in the crossfire. As noted, misconduct "does not encompass erroneous acts done by officers in good faith or honest mistakes committed by an officer in the discharge of his duties." *Coutu (On Remand)*, 235 Mich App at 706. No rational fact-finder, if properly instructed, could conclude that Officer Clark committed misconduct in office. Accordingly, we reverse Officer Clark's conviction on that count.[6]

## V. JUDICIAL MISCONDUCT

Officer Clark additionally asserts that the trial judge displayed bias against the defense and for the prosecution when questioning Officer Lyons from the stand. As a result, Officer Clark contends that he was denied a fair trial. We review de novo such questions of constitutional law. *People v Stevens*, 498 Mich 162, 168; 869 NW2d 233 (2015). If "a reviewing court has concluded that judicial misconduct has denied the defendant a fair trial, a structural error has occurred and automatic reversal is required." *Id*.

"Judicial misconduct may come in myriad forms, including . . . inappropriate questioning of witnesses, . . . [and] biased commentary in front of the jury . . . ." *Id*. at 172-173. In relation to judicial questioning of witnesses, its "central object . . . should be to clarify. Therefore, it is appropriate for a judge to question witnesses to produce fuller and more exacting testimony or elicit additional relevant information." *Id*. at 173 (quotation marks and citations omitted). But the questioning judge must be mindful not to "pierce the veil of judicial impartiality." *Id*. at 170.

> The test to determine whether a trial judge's conduct pierces the veil of impartiality, thereby violating the constitutional guarantee of a fair trial, is whether, when considering the totality of the circumstances, "it is reasonably likely that the judge's conduct improperly influenced the jury by creating the appearance of advocacy or partiality against a party." [*People v Boshell*, ___ Mich App ___, ___; ___ NW2d

---

[5] Officer Lyons testified that an officer is dutybound to obey a superior officer's orders unless those orders are illegal or immoral. This standard is supported by Detroit Police Department, Directive 102.12 (12/22/2020), available at <https://detroitmi.gov/sites/detroitmi.localhost/files/2021-01/102.12%20Duty%20to%20Intervene%20Policy.pdf> (accessed November 23, 2021).

[6] Officer Clark also contends that the trial court erred by failing to instruct the jury that to convict him of misconduct in office it must unanimously agree on the act found to support the charge. As we reverse Officer Clark's misconduct-in-office conviction, we need not consider this claim of error.

___ (2021) (Docket Nos. 347207, 347208); slip op at 13, lv pending, quoting *Stevens*, 498 Mich at 171.]

As described in *Stevens*, 498 Mich at 171-172:

> This inquiry requires a fact-specific analysis. A single inappropriate act does not necessarily give the appearance of advocacy or partiality, but a single instance of misconduct may be so egregious that it pierces the veil of impartiality. Ultimately, the reviewing court should not evaluate errors standing alone, but rather consider the cumulative effect of the errors.
>
> These errors must be considered within the context of a given case, i.e., the totality of the circumstances, to determine whether the judge demonstrated the appearance of advocacy or partiality on the whole. In evaluating the totality of the circumstances, the reviewing court should inquire into a variety of factors, including the nature of the judicial conduct, the tone and demeanor of the trial judge, the scope of the judicial conduct in the context of the length and complexity of the trial and issues therein, the extent to which the judge's conduct was directed at one side more than the other, and the presence of any curative instructions. This list of factors is not intended to be exhaustive. Reviewing courts may consider additional factors if they are relevant to the determination of partiality in a particular case. Moreover, the aggrieved party need not establish that each factor weighs in favor of the conclusion that the judge demonstrated the appearance of partiality for the reviewing court to hold that there is a reasonable likelihood that the judge's conduct improperly influenced the jury. The reviewing court must consider the relevance and weigh the significance of each factor under the totality of the circumstances of the case.

Officer Lyons testified at Officer Clark's trial with a promise of immunity. Officer Lyons explained on direct examination that he was on patrol when Sergeant Glaza contacted him for assistance with "a knock and talk." The purpose of the "knock and talk" was to "knock at a suspect's known address, attempt to speak with that suspect, and attempt to make . . . an arrest." Officer Lyons was aware that they were looking for Michael Hopkins. Officer Lyons further described how he kept watch at the home's side door. From his position, he heard a "thump" when the door was barricaded and then heard parts of a conversation, leading him to believe that two people were inside. Officer Lyons "inform[ed] Sergeant Glaza" based on this activity "that there was becoming a heightened sense . . . of a threat."

During cross-examination, Officer Lyons admitted that "if you are able to make an arrest, hopefully, there's a warrant issued." On redirect, the prosecutor inquired whether the officers had an arrest warrant. Officer Lyons replied that they did not because "there was . . . probable cause." He also conceded that they had no search warrant, but explained that he did not expect a search to occur given the small size of the team. But Officer Lyons admitted that at one point he checked to see if the side door was locked.

The court then interjected its own questions:

*The Court*: [Officer] Lyons, why did you try to open the side door?

*The Witness*: I was trying to see if it was locked, if the door was locked.

*The Court*: Why?

*The Witness*: Just as . . . a potential entry point had we needed to make entry.

*The Court*: Without a warrant, okay.

*The Witness*: Well, I'm not saying that I was - -

*The Court*: Without a warrant.

*The Witness*: I'm sorry, your Honor. Well, in case we had to get a warrant or to see if it was unlocked.

*The Court*: Okay, but, you did not get a warrant in this particular case, correct?

*The Witness*: Correct, we did not get a warrant.

*The Court*: With regard to the white vehicle that was in the parking lot [sic], did you have the capacity to run that vehicle?

*The Witness*: No, Your Honor, not at that point.

*The Court*: Your scout car did not have any computer in the car to run the vehicle?

*The Witness*: Correct.

*The Court*: But, you ran Mr. Cornelius's name to determine whether or not he had a record, you were able to do that, correct?

*The Witness*: I don't know if that was a phone call made after, or prior to.

*The Court*: But, a phone call could have been made to run the vehicle that was in the driveway, correct?

*The Witness*: Yes, but in - -

*The Court*: Yes, thank you. [Defense counsel]?

The trial judge's questions strongly insinuated that the judge believed that the officers legally required a search warrant and that Officer Lyons should have made a phone call to determine ownership of the white SUV in the driveway before entering the home. The judge's questions were neither brief nor impartial, and clearly reflected the court's bias toward the

-11-

prosecution. The judge exceeded the scope of permitted judicial inquiry and instead "emphasiz[ed] [and] expos[ed] potential weaknesses in [the] witness's testimony [and] convey[ed] the judge's personal view on whether a witness should be believed." *People v Swilley*, 504 Mich 350, 373; 934 NW2d 771 (2019). "Questions from a judge that are designed to emphasize or expose incredible, unsubstantiated, or contradictory aspects of a witness's testimony are impermissible." *Id*. at 374.

Standing alone, this error might not require reversal of Officer Clark's convictions. However, given the lack of evidence that Officer Clark harbored the necessary corrupt intent to engage in misconduct in office, the judge's clear expression of her belief that the officers acted illegally without a warrant was fatal. This error is structural and requires reversal not only of Officer's Clark's misconduct-in-office conviction but also his conviction of breaking and entering. The court's statement at the close of trial that the jury "must pay no attention to" any opinion the jurors perceived the judge to hold was too belated to sufficiently cure this error.[7]

We reverse.

/s/ Mark T. Boonstra
/s/ Elizabeth L. Gleicher

---

[7] As reversal of Officer Clark's convictions are required by the insufficiency of the evidence and the trial judge's improper questioning of Officer Lyons, we need not consider Officer Clark's final challenge to the prosecutor's conduct during closing arguments.